Good morning, Your Honor. Mark Pivko from Barron & Budd on behalf of plaintiff's appellants. There's several issues in this case, obviously, but I want to spend we have limited time and I want to spend it focusing on the RICO issues and if there's a little bit more time talking about the catalyst fee and I'd like to reserve a minute or so for rebuttal. Okay. I understand that the court system is But the facts here are not ordinary business conduct and this is not these are not routine contracts. In March of 2014, the United States Office of Inspector General issued a scathing report talking about these property inspection companies. The abuses were rampant. The conduct was outrageous. They found that... What allegations do you have in this case that the inspection companies were doing anything outrageous? Well, that report is part of the record in... But I didn't understand you to be making an argument. I mean, the inspection companies went out and inspected when they were asked to and they charged a pretty low fee for it and there it was. No, see, that's the thing I want to make clear is that the way in which these were done, the reports didn't generate any meaningful information and the inspection companies knew it. There was no management as a result of the flawed procedures within the servicers. There was no management of these companies and they were not doing their job. They were happy to take tens of millions of dollars a year from the loan servicing companies to do what was obviously unnecessary. Let me walk through some of our... Before you walk through that, because I think we will understand it unless you want him to walk through it, it seems to me that there's no common purpose here except some contractual relationship. Well, that's what I wanted to make clear and that's why I'm pointing out this report that where the Office of Inspector General found all this bad conduct. Well, so... In this particular case, reading it as best I can for you, I'm having trouble as to why there is any common purpose beyond the contractual relationship. Well, because... So what happened with these mortgage servicers is they got too big for their bridges. At the time... That could be beyond the contractual relationship, but I don't want that. I want some facts. The only thing they were doing is following the contract. But they weren't. They weren't. They were performing inspections which they knew to be unnecessary, which they knew didn't generate any useful information. They went to the wrong houses of people. They locked the doors of the wrong people. Let me explain something about one of Ms. Ellis. She lives in a little bungalow in Los Angeles in a canyon. Her house is covered with tall, two-story high bushes and trees. The way you get into the house with your car is through some back alley. Doing a drive-by inspection of her house yields you no meaningful information. What does it tell you? Well, who decides what's meaningful information? I mean, how do we know that they're not just looking to see whether there's a car parked there so that we know whether it's occupied or something like that? I mean, how do you know it's not meaningful information? Exactly. The loan servicer had a duty under the contracts, and they were told by the investors, including Fannie Mae, that you weren't supposed to charge for repeated fees like this unless you've made a determination that the loan servicer was supposed to have a procedure in place to gather that information. They were on the phone with these people. When it's your primary residence and you're in default, you still care about your house. All of our clients were deeply concerned about, yes, they had inability to pay, but they wanted to stay in their house. Their house was important to them. They were taking care of it, and Chase had ample information about that. How did Chase know they were taking care of it? They talked to them on the phone. There's records that they... Sure. I mean, how do you know when you talk to someone on the phone that they're taking care of their house? Well, because they're telling you. How are these property inspections that don't generate any meaningful information that just say the same thing you can't even see inside the house? Why is that more probative than what a borrower tells you when I'm staying in the house? I want to work it out. These weren't necessary. They didn't achieve that purpose. They didn't even look at them. Not only Chase didn't look at the reports, we ultimately got deposition testimony from some of the vendors. They didn't even look at them. How are these useful... How is it purposeful to do these inspections if you're not looking at the information and making any decisions based on it? Would the inspector have had any way to know whether Chase was looking at the reports or not? Well, the inspector knew they weren't looking at it. And yes, as we allege, I believe it's in... What does that mean? The inspector wrote the report. How are they not looking at it? There's individual subcontract out, like, I can hire you to go do an inspection, but I'm the inspection company. The inspection company wasn't looking at the reports. You send it in to me and they never look at it. And we knew that from deposition testimony. And then all they did was upload some basic information back to Chase and no one at Chase looked at it either. So in paragraph 114, we allege how they designed these policies and procedures in collaboration with the vendors. So everybody knew what information was being shared back and forth. Beyond the contractual relationship, I'm still having trouble finding the common purpose to engage in racketeering. And so I read your First Amendment complaint and it seems to me the best you say is, they associated together with J.P. Morgan for the common purpose of routinely and repeatedly ordering, conducting, and assessing borrower's accounts for unnecessary defaulted services. Is that the best we got? Well, that's what's in the complaint, yes. Is that the best? Well, that is the best summary of what's in the complaint. And then let me tell you, we started... I mean, to my book, that's not a common purpose to engage in racketeering. Well, we cited to the U.S. versus Feldman case, which is a case from this court. I know what you cited, but I'm just having a tough time. I'm trying to get you to the points that you have to make it to get to RICO. So help me. Well, so... Rather than citing me to a case. Tell me, why is that enough? In the First Amendment complaint, that's all it's alleged to say, a common purpose to engage in racketeering. Well, it's not. We allege that they worked on these procedures collaboratively and that they knew it was unnecessary. They knew these inspections were unnecessary. Were the vendors involved in charging the borrowers? No, they weren't involved in that. But the law doesn't require that members of the enterprise be involved in all aspects of the enterprise. And that's why I want to point out that this Feldman case, it's authority from this court. And if you look at the facts there, there, it was two brothers and some corporations they owned. And the common purpose of that enterprise was to defraud insurance companies through arson. And the court, it's discussed all over the opinion. One of the brothers, Albert, and the corporations did not have any knowledge or intent to defraud the insurance companies or conduct the arson. And so that case is squarely on point with what we have here. You can use other members of the enterprise as instrumentalities to carry out your scheme. And that's what we allege here. We allege that Chase used these companies as instrumentalities to carry out the RICO scheme. And like I said, it's not ordinary business conduct. When they knew these weren't necessary, they got prosecuted by the Illinois Attorney General. The U.S. government went after them. And this is just not ordinary business conduct. These weren't yielding any information. The investors, in fact, told the loan servicer, go ahead and do these as much as you want, but you can't charge the borrowers for these unless you have done some sort of evaluation that it's necessary. And they never did that. They didn't have a system here. And the proof of that is that after we filed the case moving into the catalyst issue, they changed their policy and procedures. Well, I'm having trouble with that because it seems to me that one day after the the, if you will, the policies and procedures changed, and I didn't, I'm really having trouble why your suit did it. Well, that's, that's actually not correct, that one day after the, the... Sue was initiated one day after the settlement was announced. Right, but they didn't change their policies until May of, or March of 2013. It was like 14 months after that happened. And the truth is, all the NMS did was... Is it a tough thing for me to suggest that the $1 billion fine from the federal government was much more of a catalyst than your suit? But they didn't change it. They didn't, they didn't change it then. You know, in fact, it was... And what is my, and what is my standard of review in determining whether these were catalyst fees to you? It's an abusive discretion standard. And so therefore, given that the district court felt like it was the billion dollar fine more than you, I've got to find that he abused, it's illogical that that was it? Well, let me speak to that. There's a case, McDonald v. Ford, that is one of the seminal cases. It's a district court case, but it discusses all the California cases. It's a very illustrative case on the catalyst fee issues. One of the things that it talks about is that you need testimony from the decision makers in order to determine that the, so no defendant's going to admit that they changed their lawsuit. That's rare. I would, I would imagine that would happen. So you need testimony from the decision makers to, for them to say, I changed, I know why we made the, why we made the change. I was the decision maker and it wasn't because of this. The court noted that in, in her order. And, but critically, the, Chase submitted two declarations in support of their argument here. And if you look very, they were cleverly worded declarations. What they said is, I'm in charge of these policies and practices, and if the change was made because of that, I think I would know. They did not say, I'm the decision maker, I made the change. They were not, these people were not part of the decision. They don't know why. They said, I don't know. They, they also said, I didn't know about the case. Well, of course, they didn't know about the case. These were mid-level people who were in charge of implementing things that were, that their superiors made those decisions. You don't have, so the court made its determination based on evidence that was inconsistent with what's required under the law. Okay. You've used your time. Thank you. May it please the Court, I'm Robert Wick for the Chase defendants. Turning first to the RICO claims, the district court correctly held that the plaintiffs failed to plead a RICO association, in fact, enterprise, because they did not adequately allege that the property inspection vendors shared the alleged common purpose of the enterprise. The common purpose that was pled in the complaint, and that was originally argued, was a common purpose that focused, in particular, on charging borrowers for unnecessary property inspections. There had to be ordering, conducting, and charging borrowers for improper property inspections. As I understand the plaintiffs in their reply brief, they now concede that the district court was correct, that they are not alleging that the property inspection vendors shared any common purpose that extended as far as charging borrowers. If you look at pages 5 and 6 in footnote 1 of the reply brief, it's — it was shocking to me, because what it says is, quote, plaintiffs never alleged or at least never intended to allege, close quote, and then they go on to say that anyone other than Chase had any intent to charge borrowers for unnecessary inspections. And to remove any doubt that they are conceding that the district court was correct about that, they drop a footnote 1, which says, we apologize, the complaint is inartfully pled to the extent where we pled that the property inspection vendors shared the common purpose of charging borrowers. So they're conceding That's one of the reasons, well, a major reason why I got the question from me, what's the common purpose? Right. So what common purpose do they have left? As I understand it in their reply brief, they're coming up with a new and narrower common purpose. They're trying to narrow the common purpose down to the point that they can try to allege that the property inspection vendors shared it. And if I understand the reply brief correctly, what they are now saying is that the property inspection vendors' common purpose stopped once the inspections were conducted. The new and narrower common purpose is ordering the inspections and conducting the inspections, but not charging them. Once we get into the charging of the inspections, we're past the alleged RICO enterprise, and we're only into chase conduct, not enterprise conduct. There are three reasons that new and narrower common purpose doesn't salvage their claims. First, it is never clearly articulated until their reply brief in this Court. It's not pled in their complaint. It's not argued to the district court. It's not even clearly stated in their opening brief. It emerges for the first time, at least in a way that I could understand it, in their reply brief. So it's waived. Secondly, even that narrow common purpose, even when they go to plead that narrow common purpose, they're still inserting the word unnecessary. They're saying that the common purpose of the inspection vendors was to conduct inspections that were unnecessary. But they haven't pled any facts in the complaint that would sustain the property inspection vendors having a purpose that goes as far as inspections being unnecessary. Under the facts pled in the complaint, all we have is a contractual services agreement. Chase orders inspections. And when the inspection vendor gets the order, it carries out the order. It does the inspection. It reports the inspection results back to Chase. The end. Nothing in those factual allegations supports a plausible inference that the inspection vendors had any intent, any purpose, any ---- Sotomayor, are you arguing that they must have known they must have known it was unnecessary because they weren't really doing anything that could be of value you think he'd have to amend? I don't think he could amend to say ---- I don't think he has a Rule 11 basis for amending to say that the property inspections knew one way or the other exactly how Chase was or was not using the inspections. And by the way, his arguments that nobody ever used these inspections and they were worthless is not substantiated at all in the record. It's not substantiated in general, but we're not talking about a class that was never certified here. We're talking about the 24 inspections that were charged to these named plaintiffs. And there's no evidence that any of the inspections charged to these named plaintiffs, 20 ---- only 24 inspections out of 177 months of delinquency, there's no evidence that any of them were unnecessary. If you look at the Chase brief at page 4, we give all the record citations of exactly how the property inspections were used. They were, in fact, reviewed by the vendors. They weren't reviewed by a human being at Chase, but they were reviewed by human beings at the vendors. And if they indicated lack of occupancy or if they indicated that the properties needed maintenance, then steps to preserve and secure the property were taken. Beyond that, they were reviewed electronically by Chase. If any of the electronic results indicated deterioration of the property or vacancy at the property, that triggered electronic orders to issue for somebody to go out and maintain the property. The third and final problem with the new and watered-down, narrow common purpose that they're now trying to plead on reply, far too late, is that it creates a gap between the alleged pattern of racketeering, the alleged pattern of mail and wire fraud, and the enterprise. Under the U.S. Supreme Court's decision in Reeves, if you have a pattern of racketeering that only conducts the defendant's own affairs and doesn't conduct the enterprise's affairs, you don't have a RICO claim. And when they narrow down, shrink down that common purpose so that the enterprise's purpose is limited to conducting inspections, right, when the enterprise's affairs end once the property's inspections are conducted, you now no longer have the pattern of mail and wire fraud conducting anyone's affairs but Chase's affairs. Another way to say it is this. The RICO enterprise has to be the vehicle for carrying out the acts of racketeering. The Ninth Circuit's en banc decision in Odom, among others, says that, right? You can't have an enterprise over here and mail and wire fraud over here. The enterprise has to be the vehicle for carrying out the pattern of mail and wire fraud. Well, under this new, narrowed-down common purpose, that's not true. The mail and wire fraud occurs entirely outside the enterprise. It is purely Chase's conduct. The Chase is not using the enterprise as the vehicle for carrying out the mail and wire fraud because the enterprise, by definition, is over and done with once the property inspection is conducted. The mail fraud, the alleged mail fraud, occurs after that. The alleged mail fraud consists of Chase mailing the borrower, saying, you owe me this money, which the plaintiffs say isn't owed. Is that a way of saying that the common purpose needs to be fraudulent, or are you not really arguing that? The common purpose – I'm not saying that in every single RICO case the common purpose would have to be a fraudulent one. And the district court was clear about that, too. The district court said common purpose doesn't have to be fraudulent. It just so happens that the purpose that they pled was a fraudulent one. What we are saying is that the enterprise has to be the vehicle for carrying out the pattern of racketeering. Now, sometimes the enterprise could be an unwitting vehicle, right? You could have a pizza parlor where the owner of the pizza parlor doesn't know that anything bad is happening, and unbeknownst to him, all the pizza delivery guys are dealing or are delivering drugs along with the pizzas. In that instance, the enterprise, the pizza parlor, would still be the vehicle for carrying out the pattern of racketeering, even though the pizza owner was unwitting. We're not saying they always and necessarily have to plead a common fraudulent purpose, but here the consequence of not pleading a common fraudulent purpose is they create this gap between the pattern of racketeering on the one hand and the RICO enterprise on the other. RICO doesn't – And it doesn't matter whether it was a common fraudulent purpose. It's just that it was a common purpose. Yeah. They are on the horns of a dilemma. I mean, they're the ones who said fraudulent. Right. They could prove it if they hadn't said fraudulent. They'd still have to prove the common purpose, as I understand. That's exactly what the district court said, Your Honor, and we believe correctly. She said maybe you didn't have to plead a common fraudulent purpose, but that's the common purpose that you chose to plead, and your factual allegations just don't sustain that conclusion of law. Could I ask about your preemption arguments? I'm wondering if we agree with you on the merits of why the State law claims would fail, do we need to talk about preemption at all? No. If you agree with us that they – that the unjust enrichment claims are barred by contract and that the fraud claims fail on the elements of fraud, you wouldn't need to reach preemption. There are – there is a new argument that appears for the first time in the reply brief on unjust enrichment, which is that Chase can't invoke the contract as a bar to the unjust enrichment claim because Chase is a nonparty to that contract. There is not a whisper of that argument in their only – in their opening brief, which deprived me of the opportunity to brief it. But among other things, the argument is wrong because Section 20 of all three named plaintiff's loan agreements says that Chase or a Chase predecessor, after it originated the loan, may sell the loan on to a third party while reserving to itself the contractual right and responsibility to service the loan contracts. You can see that in SRE 140. As to the common law fraud claim, they also make a brand-new argument in their reply brief. In their reply – we – we argued that the – the alleged misrepresentation here, that Chase had the contractual authority to charge for these property inspections when, in fact, it allegedly lacked that contractual authority, cannot be the basis for a fraud claim because it's an opinion of law and not a misrepresentation of fact. The brand-new answer to that argument that comes up in the reply brief is they say, well, the plaintiffs were entitled to rely even on Chase's opinion of law because Chase had superior information. It should have known more about whether the inspections could take place or not. Number one, that argument is not made anywhere in their opening brief, so I didn't get a chance to brief it its way. Number two, the Ninth Circuit rejected an almost identical argument in Miller v. Yokohama. There, the – there was an employer that – that represented to an employee, you're not entitled to overtime pay because you're a salaried employee. The employee said, even though that's an opinion of law, I can rely on it for my fraud claim because the employer should have superior information about whether or not I'm entitled to overtime pay. And the Ninth Circuit said a bald assertion that the employer had superior information was not enough to get the plaintiff out from under the general rule. Same thing here. A bald assertion that Chase has superior information doesn't get the plaintiffs out from under the general rule. Thank you. I see I've gone over. Thank you for your argument. Thank you, Your Honors. You may have 30 seconds. I gave you over, but I guess I'll give you another 30. Thank you. I'd just like to – I was not given the opportunity to – for leave to amend in the district court, and it was only our second chance at it. But weren't you outside of the time under the scheduling order, and you had to show good cause for that? We did have to request it because it's no fault of anyone, but as you know, the courts are very busy, and it took nine months for the court to rule on the original motion to dismiss. Discovery was stayed during part of that time. The case was really in its nascent stages at that point. But it really was to the court's discretion, right? To grant leave at that point? Yes. But I think under the – when we said this is – we didn't intend to plan it. I mean, you didn't have an automatic opportunity to do it. It was under their discretion. Right. But we made it clear that we did not intend to plead a fraudulent common purpose, and I don't think that the court system should be a gotcha kind of way that things are ruled on. When we said this isn't what we meant, maybe our pleading isn't as inartful. We should have had the opportunity to present a more clean pleading. Thank you. All right. We're moving then to – oh, 1-6-1-7-0-0-5 is submitted, and we're moving to 1-6-1-7-0-0-8, Stitt v. Citibank.
judges: N.R. Smith, Friedland, Lynn